This is a will contest. A Chinese, Dong Ling Hing, generally known as D.L.H.D. Grover, a resident of Park City, Utah, died February 11, 1926, at the age of 63 leaving a substantial estate. Upon application for probate of the estate of the deceased, Dong Team Chew, also known as Joe Grover, the reputed son of the deceased, was in February, 1926, appointed as administrator and thereafter qualified and has continued to act as such administrator to the present time. In March, 1927, the Central Trust Company, a corporation, filed a document purporting to be the last will and testament of the deceased, wherein Mrs. Annie Levey is named as executrix and as sole beneficiary, and petitioned the court for the probate of such document as the last will and testament of the deceased. Mrs. Annie Levey, the person *Page 327 
named in the will as executrix, filed her renunciation of the right of appointment and requested that petitioner be appointed as executor. The son, Dong Team Chew, filed objections to the purported will, alleging that it was not the last will and testament of the deceased; that the deceased did not sign the will; that it was not attested as required by law by the persons whose names appear as witnesses; and that the will was procured by fraud. The case was tried to the court without a jury, and the district court made findings of fact, conclusions of law, and entered judgment in favor of the contestant, adjudging that the alleged will was not the last will and testament of the deceased, and denied the probate thereof.
We are met at the threshold with a motion of the respondent to strike the bill of exceptions on the ground that the bill was not served within the time provided by Comp. Laws Utah 1917, § 6969, as amended by Laws of Utah 1925, chap. 51.
The motion for a new trial was overruled January 2, 1929, and notice of appeal served July 1, 1929. The court, on timely applications, extended the time within which the bill of exceptions might be served, filed and settled up to and including August 31, 1929. The bill was served, filed 1 and settled August 29, 1929, within the time allowed. It is the contention of respondent that the amendment of 1925 imposed a limitation on the discretionary power of the court to enlarge the time within which a bill of exceptions might be served, filed, and settled, and fixed that limit at thirty days after service of notice of appeal. This question was settled inHurd v. Ford, 74 Utah 46, 276 P. 908, wherein we held that the trial court acted within its power in granting an extension of time beyond the thirty-day period after service of notice of appeal as provided in the amendment of 1925. We see no reason for now placing a different construction upon this statute. The motion to strike the bill of exceptions is denied.
The chief issue before the court is the validity of the purported will, whether it was duly and lawfully executed *Page 328 
and published by the deceased, and duly attested by the subscribing witnesses. It is alleged by contestant and denied by the proponent of the will that contestant is 2 a son of the deceased. That issue is important here only as affecting the right of contestant to object to the probate of the will. If he is an heir of the deceased he undoubtedly has a right to contest the will, but if not he is a stranger to the proceeding. On these issues the court made findings as follows:
"That the said Dong Team Chew is the son of the said Dong Ling Hing, deceased; that he was born in Canton, China, about the eighth day of July, 1902; that he was received and entered into the United States, by the Immigration Department of the United States Government, as the son of the said Dong Ling Hing on or about the thirty-first day of May, 1918; that he was so received and entered into the United States as a citizen thereof upon the application of said Dong Ling Hing; that immediately upon his entry into the United States the said Dong Team Chew, contestant herein, went to Park City, Utah, together with his father, the said Dong Ling Hing, and took up his residence at that place with the said Dong Ling Hing; that at all times thereafter until his death the said Dong Ling Hing continuously held out to his friends and to the public that contestant was his son; that at all times after the entry of Dong Team Chew into this country the relations between the said Dong Ling Hing and said Dong Team Chew were friendly, the association between them at all times being that of father and son; that at the time of the death of the said Dong Ling Hing, contestant was residing with him at Park City, Utah.
"That at the time of the hearing on said petition for probate and said objections thereto Edward Fitzpatrick, who appears as an attesting witness to said alleged will, was dead, and Barnard Duffy, also appearing as an attesting witness thereto, was residing in Ireland, of the Kingdom of Great Britain; that the deposition of said Barnard Duffy was not taken, and the only witness produced by said proponent as to the execution of said alleged will was Mrs. Annie Levey, who, by the terms of said alleged will, is made the sole beneficiary thereof.
"The Court finds that the said Dong Ling Hing was illiterate; that he could neither read nor write the English language; that said alleged will is a typewritten instrument in the English language; that said instrument was not read to him; that he did not know the contents thereof; that he did not sign said alleged will; that he did not sign said alleged will knowing the contents or the purport thereof. *Page 329 
"The Court further finds that neither of said attesting witnesses, Barnard Duffy and Edward Fitzpatrick, signed said instrument as the will of the said Dong Ling Hing or knowing the same to be the will of the said Dong Ling Hing; that the said Dong Ling Hing did not declare to them or either of them that said instrument was his will; that the said Dong Ling Hing did not request said attesting witnesses, or either of them, to sign said alleged will or to witness the same; that neither the said Barnard Duffy nor said Edward Fitzpatrick signed said instrument in the presence of or at the request of the said Dong Ling Hing; that they did not sign said instrument in the presence of each other.
"That said alleged will is undated; that the said Annie Levy testified at the hearing of this cause that the same was executed in the late summer or early fall of either the years 1919 or 1920; that the said Annie Levy was not in any way related to the said deceased and said deceased was not, at the time of the alleged execution of said will, in any way obligated to her."
These findings are assailed as not being supported by the evidence.
This is a law action triable by jury had either of the parties chosen to have it so tried. In such a case this court cannot weigh and pass on conflicting evidence, or pass on the credibility of witnesses. We are restricted to a review and determination of errors of law and the competency 3-5 and sufficiency of the evidence to support the findings. The document offered for probate is not admitted to be the will of the deceased. Both the execution and attestation thereof are denied. The burden of proof was on the proponent of the will to establish by preponderance of the evidence both the lawful execution by the testator, and attestation thereof by the witnesses.
We shall first consider the finding that Dong Team Chew, or Joe Grover, was a son of Dong Ling Hing. The deceased was a Chinese, born in San Francisco, and therefore a citizen of the United States of America. Twice he had gone to China, where he had married three women and where several children were born to him. He returned to the United States the last time in 1902 and went to Park City, where he had previously lived. He seems to have engaged in the *Page 330 
laundry business and by industry and thrift accumulated a considerable amount of property which at the time of his death consisted of some sixty or seventy houses located in Park City and worth, according to the inventory and appraisement on file, about $36,000. He, at various times, attempted to bring four of his claimed sons into the United States. Two of these were admitted and two were denied admission. Joe Grover was admitted to the United States in 1918 after an extensive investigation by the immigration officials of the government. He was born in Canton, China, about July 8, 1902, of Lee Shee, third wife of the deceased, shortly after the deceased had left Canton to return to the United States. Contestant came to this country at the request of the deceased, who met him at Seattle, and, after investigation by immigration officials, brought him to Park City, where the two lived together for more than a year. In 1919 contestant came to Salt Lake City, where he was employed for a time in a cafe and later conducted a restaurant business financed by his father and uncle and himself. In 1924 he returned to Park City and there lived with the deceased until the death of the latter in 1926. The record of investigation made by the immigration officials was admitted in evidence as Exhibit C, and therein was contained a statement of the deceased, to which he took oath, that contestant was his "blood son," and also an affidavit by the deceased wherein he stated that the boy Ding Him Joe (the contestant) is his son by Lee Shee. Many witnesses from both Park City and Salt Lake City testified that the contestant was introduced, acknowledged, held out, and treated as his son by Grover. A Chinese woman, Mrs. King, quoted Grover as saying, "He is the only boy I got and I want him to be a good boy and learn how to take care of my business because I got quite a big income and when I am gone I hope he take care of it." Objection was made to the admission of Exhibit C in evidence. This exhibit is an entire file certified by Luther Weedin, the Immigration Commissioner at Seattle, Wash., as "the complete record covering the case of Dang Tim Chiu, alias Ding Him Joe, admitted at the *Page 331 
port of Seattle, Washington, June 3, 1918, as the son of Ding Loong Hing, a native," and was produced by the District Inspector of the United States Immigration Service for the State of Utah, who received it from the Bureau of Immigration in the office of Secretary of Labor at Washington, D.C. Attached to this record is a certificate of George J. Harris, Assistant Commissioner General of Immigration, that Luther Weedin is now and was at the time of signing the attached certificate the Commissioner of Immigration at Seattle, Wash., and another certificate of the Assistant Secretary of Labor "that George H. Harris who signed the foregoing certificate, is now, and was at the time of signing, Assistant Commissioner General of Immigration and that full faith and credit should be given to his certificate as such." At the time Exhibit C was offered in evidence, there was considerable discussion between court and counsel as to the admissibility of certain of the papers contained therein, and it was conceded by counsel and accepted by the court that certain letters attesting the good character of Grover were not admissible and these were excluded. The following colloquy took place with respect to the affidavit of Grover and declarations made by him as shown by the record:
"Mr. Wilson (Attorney for Contestant): The affidavit of D. Grover, however, is, I take it, competent evidence as a declaration.
"Mr. Ray (Attorney Mr. Paul Ray, representing the Proponent): Oh yes.
"The Court: Yes, I think so. That is of Grover, Sr.
"Mr. Wilson: Yes.
"Mr. Ray: That might. Such evidence as that is competent, if properly authenticated or properly produced. I will admit the declarations of the father may be received."
This we think a correct application of the law, since certainly declarations of an ancestor are 6-8 admissible in evidence as affecting pedigree. 3 Jones, Comm. on Evidence (2d Ed.) 1131.
The affidavit and declarations of the father were competent and were properly received in evidence. They come *Page 332 
from an official source and were properly authenticated. It does not follow, however, that all the papers contained in Exhibit C were admissible. Because of different issues and different parties, it is doubtful whether any of the other papers and documents were admissible. We think the admission of the exhibit was harmless inasmuch as the case was tried to the court without a jury and there is ample evidence properly received to show that contestant was a son of the deceased, and, indeed, for the further reason that the documents which should have been excluded are if anything more favorable to the contention of the party objecting than to the party offering the evidence. About the only evidence in the case casting any doubt on the parentage of contestant is that contained in the letters and opinions of the immigration officials and the other documents in Exhibit C. The finding that the contestant Dong Team Chew is the son of the deceased Dong Ling Hing is fully supported by the declarations of the deceased contained in the exhibit when considered with the testimony of other witnesses to the effect that the boy was by the father declared to be and held out and treated by him as his son. The finding of the court on the issue of relationship between contestant and deceased is adequately supported by competent evidence.
The execution and attestation of the will depends almost entirely upon the testimony of Mrs. Annie Levey, the sole beneficiary. There is some evidence tending to show the signature of the deceased as genuine and that the 9 signatures of the subscribing witnesses were also genuine. Neither of the subscribing witnesses were produced at the trial. One, Edward Fitzgerald, was dead, and the other, Barnard Duffy, was not within the jurisdiction. He had some time prior to the time of trial left the United States and was then residing in Ireland. Mrs. Levey, at the time of trial, was 46 years of age. She was born in Ireland, was married, and lived with her husband, a night watchman at one of the mines near Park City. She had for many years conducted a boarding house. The two attesting witnesses *Page 333 
had at times boarded and roomed at her house. The deceased had done washing for many of the roomers at the Levey house. Both Mr. and Mrs. Levey seem to have been on intimate terms with the deceased during a period of many years. They had loaned him money at different times and advised and aided him in connection with his business affairs. These amicable relations seem to have been disturbed at one time about two years before the making of the alleged will. There was introduced in evidence the record of a case tried in the district court of Summit county, wherein Grover was plaintiff and Wm. Levey, husband of Mrs. Annie Levey, was the defendant, wherein the plaintiff charged fraud against Levey in connection with a note transaction. The court had found in plaintiff's favor, thereby reducing the claimed obligation from Grover to Levey of about $2,500 to an amount of approximately $1,000, which the deceased admitted he owed. It was contended and found by the court that fraud had been practiced by Levey in the procuring of Grover's signature to a note for $2,500, when in truth and in fact the amount owing was something less than $1,000. This was found to have been possible by reason of the fact that Grover was illiterate and could not read or understand the English language and was thus imposed upon. Mrs. Levey testified that she was interested in this litigation to the extent of at least $150, an amount claimed to be owing to her individually by Grover, which indebtedness had been merged with other indebtedness owing her husband, Wm. Levey, in the total amount involved. Objection was made to the introduction of this record on the ground that Mrs. Levey was a stranger to the litigation. We think sufficient interest in Mrs. Levey and knowledge by her was shown to justify the admission of the pleadings, findings, and judgment in that case. Appellant concedes the pleadings were admissible for the purpose of furnishing samples of handwriting of the deceased, but contends the findings are incompetent because not binding upon Mrs. Levey who was not a party to the suit. Certainly neither the findings nor the judgment were res adjudicata as to *Page 334 
her. This record was admissible, not for the purpose of binding Mrs. Levey by the judgment, nor as proof of the facts stated in the findings, but as a circumstance tending to show a breach in the friendly relations which had existed between Grover and the Leveys, and for the inferences arising therefrom that Grover would not naturally, in view of such litigation, be inclined to devise all his property to Mrs. Levey by a will executed so soon after such a lawsuit.
Mrs. Levey testified that Grover owed her money (the exact amount is not clearly shown unless it be the $150 which was merged in the judgment obtained by her husband in the suit just referred to), and that on the evening before the will was executed Grover came to her house and told her he was going to make a will and that she would get her money back. At the time of this conversation no one was present except Grover, Mrs. Levey, and her eight year old daughter. At the time of trial this daughter was sixteen years of age but was not produced as a witness. The date of the will is not definitely fixed other than that it was on an afternoon in the fall of either 1919 or 1920. The will itself is not dated. Mrs. Levey testified that Grover came to her house with Barnard Duffy and Edward Fitzpatrick. She said:
"He came in and went into the sitting room and the boys also, and he said, he pulled out a long envelope and he said he had his will and the boys and him was going to sign it. * * * And he took a little table over the window and he asked me to get him a pen and ink, and I got him pen and ink, and he sat down at one side of the table and took out the paper and wrote his name on it and he handed it across the table to Barnard Duffy and Barnard read it — he didn't read it loud, he read it to himself — and he signed his name on it. Then he got up and Edward Fitzpatrick came from a chair over that way and took that chair and lifted the paper and read it and signed his name on it, and then the Chinaman took it over and put it in the envelope and he gave it to me and I took it out of the envelope and read it. I was standing at the edge of the table. He told me to keep it."
The signature of Grover on the will is pen-printed in capital letters and not in ordinary writing. This was followed *Page 335 
by some characters having the appearance of Chinese words. An attempt was made to prove that this signature was in the handwriting of the deceased. The cashier of a bank at Park City testified and produced a signature card claimed to have been made by Grover for the bank when he made a deposit. This witness said it was his opinion that the signature on the will was genuine. He, however, did not attempt to qualify as an expert in handwriting, and on cross-examination it was shown that he did not see Grover sign the signature card and that on account of Grover's illiteracy and ignorance of methods of business that he did not have a checking account in the bank, but that his deposit was in the nature of a time deposit. This evidence is neither positive nor convincing. An inspection of the signatures of Grover on pleadings and other documents compared with the purported signature on the will show some similarities but also marked differences. The very nature of a pen-printed signature makes it easy to copy or simulate, and difficult for any one not an expert of wide experience to form or express any reliable opinion as to its genuineness. An educated Chinese testified that the characters following the name on the will were not genuine Chinese characters, but looked like an attempt to make Chinese characters by some one who was learning the language; that one of the characters meant Hing, but it was not complete.
At the time of Grover's death Mrs. Levey was in Ireland. It seems she learned of his death from Barnard Duffy, who wrote her inclosing a clipping from a local paper telling of his death. She had, previous to leaving the United States, left the will with her attorney, Mr. W.W. Ray in Salt Lake City. 10, 11 Some correspondence passed between her and Mr. Ray's office, with the result that Mr. Rawlins, a partner of Mr. Ray, went to Park City with the will and interviewed both the subscribing witnesses. Mr. Rawlins was called as a witness by the proponent of the will in rebuttal after the contestant had rested. We refer to his testimony in this sequence because the interviews he had with Duffy and Fitzpatrick were had before and not after *Page 336 
interviews with the same men testified to by Judge McDonough, and referred to later in this opinion. Objection was first made to his testimony but later withdrawn. He first called on Barnard Duffy and showed him the document and asked him if that was his signature. Duffy said: "It looks like my signature. Let me see this." But after reading the will he said. "I didn't sign that." He was then asked, "Well, isn't that your signature," and he said, "No, that is not my signature." When asked whether he had signed it in the presence of Grover and in the presence of Fitzpatrick and whether it was declared to be his last will and testament by the testator, his answers were in the negative. Mr. Rawlins then called on Edward Fitzpatrick, and his testimony with respect to this interview is as follows:
"And I had the original of this will and I asked him if that was his signature, referring to the signature appearing at the bottom `Witness: Edward Fitzpatrick,' and he looked at it and said, `Yes.' I then asked him, I could not tell exactly the same questions, but the questions I would ask a witness on proving a will, that is, the testamentary, the terms of the testamentary clause. His answers to those questions —
"Mr. Wilson: Just state what they were?
"A. Well, I can't state exactly. I know I asked him whether he signed this at the request of the testator, and I think he said, `No.' I asked him whether he signed it in his presence, and I think he said, `No.' And I asked him whether he signed it in the presence of Barnard Duffy. My memory is he said `No.' I probably asked him whether he signed it at the request of D. Grover, and I think he said `No.' I don't remember all of them but I know his answers were negative largely to the questions I asked with respect to the testamentary clause.
"Q. Now, after he had identified his signature, did he read the will? A. He read the will. He said, `What is it?' after he had said that that was his signature, and I told him it purported to be a last will of Grover, and he said, `Let me look at it,' as I remember, and he read the will, and then I asked him these questions and he gave a negative answer to most of them, as I remember it."
The attorney for the administrator of the estate, Hon. Roger I. McDonough, now a judge of the district court, but at that time a practicing attorney, had his attention called to the existence of the purported will and a copy was furnished *Page 337 
him. Judge McDonough, a witness for contestant, testified that he also interviewed both Duffy and Fitzpatrick and obtained from each of them an affidavit. Such affidavits were offered and received in evidence. The purport of his testitmony was that each of these witnesses denied that he attested the will or that he knew anything about the will of the Chinese Grover, and when Duffy was asked to explain why or how his signature appeared there, he was unable to give any explanation, since he said he had never been called on to witness a paper by Grover or in the presence of Fitzpatrick. At the time of this interview Fitzpatrick was in the hospital. The affidavit was signed by him a day or two before his death. The testimony of the witness McDonough as to his conversations with the two subscribing witnesses, and the two affidavits obtained from them, were admitted over objection. Appellant now concedes the evidence was admissible, but contends its application should be limited. Its brief says:
"At the outset we are willing to concede that in the absence of these subscribing witnesses, their subsequent declarations, either oral or written, are competent for purposes of impeachment, but for that purpose alone and none other. So to this extent we have an exception to the general hearsay rule."
This is a fair statement of the law applicable to this evidence. 1 Page on Wills (2d Ed.) 682. The conversations and affidavits were therefore properly admitted in evidence. The learned trial judge, being the trier of the facts, was justified in concluding, as he undoubtedly did, that the impeachment of the attestation of the will by the subscribing witnesses was complete. Duffy, shortly after these interviews, left Park City and went to Ireland and there met and discussed the matter with Mrs. Levey, and together with her went before a notary public and there made affidavit in which he repudiated his former affidavit given to Judge McDonough and stated that he signed the will as a subscribing witness and that it had been executed by Grover, declared by him to be his last will and testament, and that *Page 338 
it had been duly attested by him and Fitzpatrick in the presence and at the request of the testator. This affidavit was not offered nor received in evidence, except the signature, "Barnard Duffy," which was offered and received for purpose of comparison of handwriting. This affidavit, except the signature, therefore, can have no probative value in this case. Mrs. Levey later came back to Park City and was present at the trial. Duffy, however, remained in Ireland, and although his address was known to Mrs. Levey no effort was made to take his deposition.
To be valid under the statute, Comp. Laws Utah 1917, § 6315, a will other than an olographic will or 12-17 nuncupative will must be executed and attested as follows:
"1. It must be subscribed at the end thereof by the testator himself; 2. The subscription must be made in the presence of the attesting witnesses; 3. The testator must at the time of subscribing the same declare to the attesting witnesses that the instrument is his will; and, 4. There must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will, at the testator's request, in his presence, and in the presence of the other."
Comp. Laws Utah 1917, § 6322, provides that all beneficial devises, legacies, and gifts whatever, made or given in any will to a subscribing witness thereto, are void, unless there are two other competent subscribing witnesses to the will. In this case we have a unique situation where one subscribing witness was dead; the other subscribing witness was out of the jurisdiction, and both subscribing witnesses at the time their attention was first called to the purported will after the death of the deceased entirely repudiated their attestation. Their action in so doing is free from suspicion, because it was first made to the attorney for the proponent of the will and later their repudiation was repeated and emphasized in an interview with the attorney for the contestant. The proponent made a prima facie case of the execution of the will by the testimony of the sole beneficiary who testified in effect that she was present at the execution *Page 339 
thereof, saw the deceased sign, and saw the attesting witnesses sign, and that the signatures were each and all genuine. This witness, being a beneficiary, could not be a subscribing witness to the will and at the same time take under and pursuant to its terms, and yet she is relied upon to give life and validity to the instrument. While undoubtedly she was competent to testify(Miller v. Livingstone, 31 Utah 415, 88 P. 338), she admittedly is an interested witness and would have been incompetent under the statute to be a subscribing witness. Her testimony must be weighed and her credibility tested with all these facts in mind. Where the subscribing witnesses are not available, the court may receive other evidence, if any may be had, as to the facts required under the statute, and to this an identification of the handwriting of the testator and the subscribing witnesses may be made, and when this is done the facts stated in the certificate is evidence of similar effect as if testified to by the subscribing witnesses. This evidence, however, may be impeached or discredited to the same effect as if the subscribing witnesses had been present in court and had given their testimony. Farleigh v. Kelley, 28 Mont. 421, 72 P. 756, 63 L.R.A. 319, notes 114 Am. St. Rep. 238. This evidence is of an inferior nature to that of the subscribing witnesses had they or either of them been present in court and testified. Orser v.Orser, 24 N.Y. 51. The evidentiary value of the attestation clause was greatly weakened by the statements and affidavits made by the absent and the deceased subscribing witnesses. Each of these witnesses on three occasions and to two reputable witnesses, both known and respected members of the bar, made it very plain that neither, at any time, knowingly signed or attested a will of Grover. One of them, Duffy, made statements to the same effect to another reputable witness, a fellow workman. In the face of this impeachment of the signatures of the attesting witnesses it was for the trier of the fact to determine whether, under the circumstances, the attestation clause, so far as supported by the signatures of the witnesses, furnished any support to the validity of the will. *Page 340 
The learned trial judge undoubtedly came to the conclusion that the impeachment was complete, and in view of the evidence on the subject, we are not disposed to disturb his findings. Then we have left no substantial testimony to uphold the will except that of the sole beneficiary who thus becomes, in effect, the only witness to the execution of the will. This, as we have already indicated, is insufficient to justify a finding that the will was lawfully executed.
The relations of the deceased with Mrs. Levey and her husband while for a time confidential and amicable, certainly were not such as to make her a natural recipient of his bounty to the exclusion of his son who had been brought into the country by him, partly, at least, for the purpose of 18-21 training him so he could inherit and manage the estate which the deceased had through years of thrift accumulated. While the unnaturalness and apparent injustice of a will standing alone will not make against its validity, it is a circumstance which the court is entitled to consider where the validity of the will is in serious doubt. We clearly think the trial court could not well have made different findings than he did with respect to the failure of the subscribing witnesses to sign the attestation clause in the presence of each other, in the presence of the testator, and at his request. Where such serious doubt is cast upon the existence of these essential requirements of the statute, the court could do no other than to find against the validity of the will.
The signature of the testator, if it be assumed that he actually signed this document, is not conclusive of his assent to the will. While it is not shown affirmatively that he was ignorant of its contents, it is shown by the evidence of Mrs. Levey that he did not read it in her presence and in the presence of the subscribing witnesses, nor was it read to him, and no declaration or statement is shown to have been made to or by him from which it might be inferred that he knew the contents of the will. We think it is fairly established in the evidence that Grover could not read and understand the written English language. Witnesses testified *Page 341 
that they wrote letters for him and read to him letters received by him and that he was unable to read and write the English language. There is no testimony of any one that tends to indicate that he knew what the terms of this will were and that by it he was bestowing his whole estate upon Mrs. Levey to the exclusion of his son. The only evidence with respect to a publication by the testator of the will is the testimony of Mrs. Levey that when he came to her home with the two witnesses he said he would sign his will. The act of publication is not complete until the attesting witnesses understand from the testator that the instrument they attest is his will. In re Moore's Will,109 A.D. 762, 96 N.Y.S. 729; note 114 Am. St. Rep. 219. There is no evidence in the record that these attesting witnesses did so understand.
The son is not mentioned in the will. Mrs. Levey attempted to avoid the implications which must follow from this fact by saying that when Grover first mentioned his will to her she asked him if he had any family and he said no. She asked him about the boy Joe Grover and he answered he did not know him. This evidence of Mrs. Levey is entitled to very little credit, in view of the record showing the intimate and interested regard which the deceased had for the boy and the fact that Joe Grover had lived with him in Park City for at least three years and had been held out by the deceased as his son during the entire period from 1918, when he was brought into the United States, down to the time of Grover's death in 1926. Mrs. Levey expressed ignorance of any relationship between the two and claimed she had not even seen Joe Grover until after her return from Ireland. In view of the conclusion reached, it is unnecessary to pass on other questions raised by the assignment of errors.
The judgment of the district court is affirmed. Costs to respondent.
CHERRY, C.J., and STRAUP, ELIAS HANSEN, and EPHRAIM HANSON, JJ., concur. *Page 342